```
 1                  UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                     JACKSONVILLE DIVISION

 3   UNITED STATES OF AMERICA,      Case No. 3:21-cr-00106-MMH-JBT

 4         Plaintiff,               December 21, 2022

 5   v.                            9:47 a.m. - 10:56 a.m.

 6   SCOTT MATTHEW YOTKA,           Courtroom 10B

 7         Defendant.
     _____
 8
                            SENTENCING
 9
             BEFORE THE HONORABLE MARCIA MORALES HOWARD
10                  UNITED STATES DISTRICT JUDGE

11                     A P P E A R A N C E S
12
     COUNSEL FOR PLAINTIFF:
13   D. RODNEY BROWN, Esquire
       United States Attorney's Office
14     300 North Hogan Street, Suite 700
       Jacksonville, FL 32202
15

16   COUNSEL FOR DEFENDANT:
     MAURICE C. GRANT, II, Esquire
17     Federal Public Defender - MDFL
       200 West Forsyth Street, Suite 1240
18     Jacksonville, FL 32202

19
     OFFICIAL COURT REPORTER:
20   Katharine M. Healey, RMR, CRR, FPR-C
       PO Box 56814
21     Jacksonville, FL 32241
       Telephone: (904) 301-6843
22     KatharineHealey@bellsouth.net

23                          (Proceedings reported by stenography;
                             transcript produced by computer.)
24

25
```

I N D E X

PAGE

GOVERNMENT'S PROFFER................................. 6

DEFENDANT'S PROFFER................................. 17

STATEMENT BY DEFENDANT.............................. 22

COURT'S IMPOSITION OF SENTENCE...................... 26

1        P R O C E E D I N G S

2   December 21, 2022                              9:47 a.m.

3           COURT SECURITY OFFICER:  All rise.  The United States

4   District Court in and for the Middle District of Florida is now

5   in session.  The Honorable Marcia Morales Howard presiding.

6           Please be seated.

7           THE COURT:  This is Case No. 3:21-cr-106-MMH-JBT,

8   United States of America vs. Scott Matthew Yotka.

9           Mr. Brown is here on behalf of the United States.

10          Mr. Brown, could you please introduce the case agent.

11          MR. BROWN:  Yes, Your Honor.  Good morning.  This is

12  Special Agent Daniel Moxley with the FBI.

13          THE COURT:  Mr. Grant is here on behalf of Mr. Yotka

14  and Mr. Yotka is in the courtroom.  We're scheduled for a

15  sentencing.

16          Is the United States prepared to proceed?

17          MR. BROWN:  Yes, Your Honor.

18          THE COURT:  And you, Mr. Grant?

19          MR. GRANT:  Yes, Your Honor.

20          THE COURT:  All right.  Mr. Yotka, on May 13th of

21  2022 you entered a plea of guilty to Counts One and Two of the

22  indictment, which each charged you with production of child

23  pornography, in violation of Title 18, United States Code,

24  Sections 2251(a) and 2251(e).

25          The Court has accepted your guilty pleas, and so

1  we're at the stage of the proceedings where it's necessary for

2  the Court to determine the appropriate sentence.

3          There is a process that the Court must follow for

4  sentencing.  It begins with the preparation of a presentence

5  report, and the next thing that's supposed to happen is that

6  you're supposed to review that presentence report with your

7  attorney.

8          Did you have an opportunity to do that?

9          THE DEFENDANT:  Yes, ma'am.

10         THE COURT:  Did Mr. Grant answer all of the questions

11  you may have had about that presentence report?

12         THE DEFENDANT:  Yes, ma'am.

13         THE COURT:  Mr. Grant, did you have sufficient

14  opportunity to review the PSR with this gentleman?

15         MR. GRANT:  I did, Your Honor.

16         THE COURT:  Does he have any outstanding objections

17  to the factual statements or the guideline calculations?

18         MR. GRANT:  What I will say is none that we were able

19  to substantiate.

20         THE COURT:  Okay.  Thank you, Mr. Grant.

21         Mr. Brown, any objections by the United States?

22         MR. BROWN:  No, Your Honor.

23         THE COURT:  All right.  There being no objections to

24  the factual statements and the guideline calculations set forth

25  in the presentence report, the Court accepts those as its

1   findings and determines that the guidelines applicable to

2   Mr. Yotka are as follows:  Total offense level is 43.  It's

3   actually calculated higher than 43, but because that's the

4   maximum, it's offense level 43.  Criminal History Category is

5   I, which yields a guideline term of imprisonment of basically

6   the statutory maximum of 720 months, with a term of supervised

7   release of at least five years and up to life, restitution to

8   be determined, fines ranging from $50,000 to $250,000, two

9   special assessments of $100 each, a potential special

10   assessment under the JVTA of $5,000, and then under the AVAA of

11   $50,000.

12         Mr. Grant, is that consistent with your

13   understanding, sir?

14         MR. GRANT:  Yes, Your Honor.

15         THE COURT:  And yours, Mr. Brown?

16         MR. BROWN:  Yes, Your Honor.

17         THE COURT:  All right.  Then at this time I'll hear

18   from Mr. Brown with his recommendation.

19         And then, Mr. Grant, I'll hear from you on behalf of

20   Mr. Yotka.

21         And Mr. Yotka, I'll give you an opportunity to speak

22   if you want to speak.  You don't have to, but it is certainly

23   your right to do so, okay?

24         THE DEFENDANT:  Yes, ma'am.

25         THE COURT:  Mr. Brown.

1          MR. BROWN:  May it please the Court.  Your Honor is

2    advised by a very thorough presentence investigative report in

3    this case.

4          As the Court correctly knows, the defendant pled

5    guilty to two counts of production of child pornography.  I'm

6    just going to highlight some of the facts and talk about some

7    of the factors that the Court -- we suggest that the Court

8    consider, and then, of course, specifically some of the factors

9    under Section 3553(a) which the Court, of course, is obligated

10   to consider.

11         The Court is aware that this began as an undercover

12   investigation, and it really unfolded very quickly.  And one of

13   the reasons why it unfolded quickly was because the FBI came to

14   understand that real children were involved and that they were

15   potentially in a situation where they were being on- -- in an

16   ongoing state of molestation; that is, by the defendant.

17         So this undercover operation began on September 15th,

18   2021.  And essentially an undercover officer up in Washington

19   engaged in online conversation, messaging, on a public -- or a

20   social messaging app called Kik and made contact with

21   "Scottnjax44," who was the defendant.  It turns out that

22   Mr. Yotka was the administrator of this particular chat room.

23         And after the initial entrée by the undercover to the

24   chat room, Mr. Yotka responded, quote -- with a message that

25   said, quote, "All you new people that came in and have not

1   verified, please do so now."

2            This is a verification process with regard to certain

3   chat rooms in certain applications.  And the administrator

4   there, that is, the defendant, was simply suggesting that they

5   comply with the rules, which may have been providing a

6   photograph or other types of minimum requirements.

7            The conversation then went right to it.  Mr. Yotka

8   responded to the undercover, or began talking with the

9   undercover, and said, quote, "You acted with anyone?"

10           This information is set forth in -- it's not set

11   forth in detail in the presentence investigation, but it is in

12   the Criminal Complaint that was filed in this case as docket

13   number 1.

14           Mr. Yotka indicated that the children that he had

15   access to were 6G, 4B, and 1B; that is, a six-year-old girl, a

16   four-year-old boy, and a one-year-old boy.

17           He, upon questioning by the undercover which children

18   he was active with, indicated that he was active with the boys

19   "cuz," quote, "girl won't play."

20           And he goes on to say subsequently that this

21   particular girl -- who is a real -- was at the time six years

22   old and was a real person and was in the residence -- indicated

23   that -- in the chats to the undercover Mr. Yotka indicated,

24   quote, that he "wanted that with the girl" -- talking about

25   sexually explicit conduct -- "but, like I said, she won't play

1  nicely," essentially meaning that she is not interested or

2  rejects those type of advances.

3          Mr. Yotka and the undercover go on to continue to

4  discuss sexual conduct that they both had performed involving

5  children.  Of course, the undercover's conduct is all imaginary

6  and fake.

7          Mr. Yotka responded, talking about how he engaged in

8  sexually explicit conduct with the four-year-old and the

9  one-year-old, and he noted, quote, "They squirm, LOL."

10          Quote, "And they look" -- "and have that look like,

11  let's just get this over with," closed quote, during the time

12  that he was engaging in sexual activity with them.

13          He also noted that, quote, "Little one is starting to

14  bite, so gotta be careful with him."

15          When asked what he was trying to do, Mr. Yotka

16  responded, quote, "Eventually, everything."

17          And then there's that line, "Love to f-u-c-k their

18  little holes," et cetera, which is set forth in the PSR that

19  follows.

20          The undercover asked if his wife knew and Mr. Yotka

21  responded, "Nope.  Have to go around her," closed quote.

22          And in this case the two -- the charged images were

23  produced by Mr. Yotka on September 3rd, which FBI verified that

24  the mother of the victim children worked that day, had a job

25  and worked that day.  Or was at work that day, I should say.

1    There was additional conversation where Mr. Yotka

2    indicated, "Swap boys?"  Meaning perhaps they could each engage

3    in each other's -- in sexual activity with each other's

4    children.

5    And then unsolicited there were a series of images

6    and a video that were provided to the undercover and -- after

7    discussion about some of the specifics of that, because the

8    undercover said, quote, "How do I know you're a good dad too,"

9    closed quote.

10    And then Mr. Yotka sent a number of images which are

11    described in the presentence investigative report.  They

12    involve the lascivious exhibition of genitalia and anal

13    penetration of the children and also oral-to-genital

14    intercourse with him; that is, Mr. Yotka.

15    So this case involves a person who's an administrator

16    of a Kik chat room that specifically is tailored to taboo

17    conduct with children.  The case involves anal penetration of

18    two very young children.  The case involves the distribution of

19    images and videos as well, and arguably unsolicited

20    distribution.

21    The presentence investigative report also talks about

22    the preliminary conduct, that is, the offense conduct in this

23    case, and I've already mentioned that.  It also speaks to the

24    specific statements that Mr. Yotka made when he was contacted

25    when the FBI executed a search warrant at his residence on

1  September 17th.

2      And just so the Court understands how this unfolded,

3  on September 15 these conversations happen with the undercover.

4  The FBI makes contacts, they do some geolocation, and they find

5  out that this IP address -- the IP addresses that were used by

6  "Scottnjax44" resolve to Jacksonville, to two locations:  one,

7  the residence of the defendant; and two, the Ed Ball Building,

8  which is right across the street, because at the time Mr. Yotka

9  worked as an emergency dispatcher for JSO, as a public

10  emergency operator, if you will.  And so what that means is

11  that he was engaging in Kik conversations from the Ed Ball

12  Building while he was either on the way to work, on the way

13  home from work, or at work.

14      JSO cooperated with the investigation.  And the FBI

15  moved quickly to obtain a search warrant, going to the home of

16  the magistrate judge in the evening of September 16th, 2021,

17  during a -- as I recall, a rain storm.

18      They learned, with coordination with JSO, that the

19  defendant was working the night shift, and so that gave -- at

20  least the FBI knew at that time that the children were not at

21  risk and they had time to get a search warrant and not use

22  other exigency type of techniques.  And they were able to

23  execute the search warrant as he rolled up, having gotten off

24  of his shift in the early morning hours of September 17th.

25      The presentence investigative report lays out in

1  substantial detail some of the statements that he made.  I

2  wanted to point out just a few of them.

3       He admitted, eventually, sending pornographic

4  pictures of the children that he had access to.  He admitted

5  inserting a foreign object and described how he did that.  He

6  admitted that he ejaculated on at least one of the children.

7       He indicated that he did this and took these pictures

8  because he was, quote, "trying to fit in," closed quote, with

9  other members of the group.

10      He was shown several of the images and video, and he

11 acknowledged that he took them a couple weeks ago.  And as I've

12 already indicated, metadata that was imbedded on the images and

13 the video indicated they were produced during a relatively

14 short time period on September 3rd.

15      He indicated that he did not send the images and

16 video to other members of the group, meaning other members

17 other than the undercover that he was talking to.  And he said

18 in paragraph 17 on page six of the PSR, quote, "This is a

19 one-time incident."

20      We learned that that was not true, because on

21 August 24th of 2021 there were images that were uploaded to the

22 Kik app by Mr. Yotka's IP address and sent to NCMEC, and the

23 FBI was alerted to those subsequently as well.  Those

24 happened -- that upload on August 24th happened approximately

25 ten -- ten days or so before the production on September 3rd.

1   They depicted the same children in similar type images.  And so

2   it was not actually a one-time incident.

3        He indicated that he does not store child pornography

4   on his cellular phone and probably, quote, "already deleted the

5   images" he took of the two minors.  And these were minors that

6   lived in the residence with him that he had not only access to,

7   but sometimes custody and control over, obviously.

8        He -- and that seems to be true, that there was not

9   child pornography, or at least large amounts of child

10  pornography, stored on the phone.  There were the images that

11  were produced by him that were charged, and that was largely

12  it.

13       There were -- in the cyber tip that I mentioned on

14  August 24th, there were another couple of images of other

15  minors, but not on his phone.

16       He indicated that he knew that what he did was

17  harmful to the children.  And, of course, we all know, common

18  sense tells us, that that was true.  Those children suffered

19  during these -- the incidents wherein they were forced to

20  engage in oral sex with the minor and pene- -- or, excuse me,

21  with the defendant and penetrated by the defendant.

22       We even know that through his own statements that he

23  made wherein he talked about them squirming and looking like

24  they -- hey, let's just get this over with.

25       He also, by his own admission, attempted to molest

1    the third child, the six-year-old child, that was in the

2    residence as well.  But we have no information that that ever

3    happened.  And he -- so there's no reason to doubt that she had

4    rejected his advances.

5         So here's an emergency dispatcher who is charged with

6    responding to emergencies who actually created one for the FBI,

7    and with potentially devastating results for the children.

8         So the good news is, is that the FBI was able to

9    rescue the two actual victims and the other children and to

10   remove the defendant from being able to get his hands on any of

11   them again anytime soon.

12        The defendant's 48 years old.  I would suggest to the

13   Court that -- well, I would assert to the Court that he has a

14   deep-seated sexual interest in children, as proven by the

15   conduct which I've just gone through.  He's not going to

16   change.  And the guidelines recommend a 60-month -- 60-year

17   sentence in this case, and that's the sentence that we

18   recommend to the Court as well.

19        The -- this Court has some experience in similar

20   types of cases in this courthouse and similar types of

21   potential sentences.  And I'll just mention a few of them.

22   This Court, of course, tried the case of Columbus -- excuse me,

23   Colin Moran.  I can't read my own writing.

24        THE COURT:  Colum Patrick Moran.

25        MR. BROWN:  That's correct, Your Honor.  About a year

1    and a half ago.  Mr. Grant was his lawyer.  In that case, the

2    Court sentenced the defendant to a below-guideline sentence.

3    It ended up being 64 years, a significance sentence.

4            Mr. Moran's case is a little different -- well, it's

5    a lot different in ways, but the sentence is similar.  Of

6    course, we -- the United States never was able to prove -- and

7    there was no evidence that Mr. Moran actually was hands-on with

8    children, but he also had a cache of child pornography that was

9    significant, which makes it different than this case.

10            There was the case of United States vs. Columbus

11    Jeffrey, which I think Mr. Grant was also the defense lawyer as

12    well.  That was before Judge Corrigan.  There was a plea to two

13    counts of child pornography in that case involving an actual

14    11-year-old boy.  And in that case the defendant was sentenced

15    to the statutory maximum, which in that case was the

16    recommended guideline sentence, similar to this one, of

17    60 years.  A difference in that case was that the defendant

18    also had a cache of child pornography other than the produced

19    images.  But in that case the defendant also distributed the

20    image or images of the child that was molested in that case.

21            And then lastly, Andrew Leslie, who pled guilty to

22    two counts of production of child pornography involving a

23    two-year-old and I think a six-month-old.  He received a

24    statutory maximum of 60 years after a guilty plea to two

25    counts.  The guidelines recommended that as well.  The conduct

1   is similar.  The difference is that Mr. Leslie was an

2   administrator of a child pornography server and was engaged in

3   activities with people through the internet, other pedophiles

4   through the internet, and there's no evidence of that level of

5   sophistication in this case.

6            So the United States recommends a 60-year sentence in

7   this case to -- and it would not be -- it would be sufficient

8   to protect the public from this type of behavior.  It would

9   essentially incapacitate the defendant and not allow him to be

10  around children again.

11           We'd also ask for a term of supervised release of

12  life.  Even if the defendant gets a 60-year sentence, as the

13  Court knows, he won't serve all of that.  He'll serve

14  86 percent at best.  And we don't know what the future will

15  hold.  We don't know if there's the possibility of commutation

16  somewhere down the line.  We don't know if there's the

17  possibility of other types of release, early release, based on

18  various statutes.  And so that would ensure ongoing supervision

19  for a person who has a very deep-seated sexual interest in

20  children that he is willing to act on.

21           There is no restitution in this case, Your Honor.

22  The victim's mother has been not only interviewed by the FBI,

23  I've spoken with her, our victim/witness specialist who is in

24  the court has spoken with her as well.

25           As the Court may remember, she was here three weeks

1   ago when we were -- when we were set for sentencing.  She was

2   made aware of the new sentencing date by our victim/witness

3   specialist, Ms. Daniels.

4          Ms. Daniels emailed me late last night and indicated

5   that she finally heard back from -- because we wanted to

6   confirm with her that she was going to be able to come and

7   assist her in making whatever presentation, or no presentation

8   at all if she wished, to the Court, but at least have the

9   opportunity to be heard.  And she declined and she said that

10  she had to work today, and so she is not -- she is not here.

11         THE COURT:  And she's not interested in any sort of

12  counseling for the children?

13         MR. BROWN:  That's right, Your Honor.  We made

14  available to her -- you know, asked her if there was any type

15  of restitution, if there was any type of harm that she could

16  seek compensation for, and she declined any of that.  Or all of

17  that, I should say.  And I will say that there's no evidence

18  that the children have received any of that type care;

19  professional care, I should say.

20         One last point, Your Honor -- or, actually, two last

21  points, and largely housekeeping.

22         Of course, the Court entered a preliminary order of

23  forfeiture in that case.  We would ask that the Court enter a

24  final order of forfeiture with regard to the OnePlus phone.  I

25  think that was docket 42.  And so we'll ask that the Court

1    orally pronounce that and also put that in the judgment.

2            And then I would be happy to move now to dismiss

3    Count Three.

4            THE COURT:  I didn't -- hold on.

5            Mr. Brown, in document number 43 you gave notice that

6    you would not seek to complete the criminal forfeiture of this

7    cellular phone.

8            MR. BROWN:  And that's because of an administrative

9    forfeiture?

10           THE COURT:  Yes.

11           MR. BROWN:  I apologize, Your Honor.  It's been a

12   while since I looked at that.  I grabbed the preliminary order

13   of forfeiture, so I'll --

14           THE COURT:  I just knew I didn't have a final order

15   of forfeiture in the file, so that's why I was confused.

16           MR. BROWN:  And again, I apologize, Your Honor.  Lots

17   of different cases downstairs.

18           THE COURT:  Understood.

19           MR. BROWN:  Thank you.

20           THE COURT:  All right.  Let me hear from Mr. Grant.

21           MR. GRANT:  Good morning, Your Honor.

22           THE COURT:  Good morning, Mr. Grant.

23           MR. GRANT:  Your Honor, without saying, this is a

24   very difficult case for the Court and also for Mr. Yotka.

25           As Mr. Brown indicated, when Mr. Yotka was

1  interviewed by the FBI shortly after his encounter, he

2  acknowledged and admitted virtually all of the conduct which

3  has given rise to the charges for which he is facing today.

4         Prior to August of last year, July, June, Mr. Yotka

5  lived what would probably be described as an ordinary life.

6  And that is to say that he was born in 1974.  At the age of

7  four he was adopted.  He was raised by his adoptive parents.

8  He graduated from high school on time, in 1992.  He went to

9  work, just like most kids coming out of high school.

10        1997 he got married.  And then after getting married,

11  in order to support his family that was coming, he enlisted in

12  the Army.  And that was in March of 19- -- of 1997.

13        Unfortunately for him, he had physical incapacitation

14  which caused his discharge from the military.  I believe it was

15  in October of 1997.

16        So up until that time he was just like any other

17  child or young adult who is trying to establish a life for

18  himself, oftentimes going into the military, hoping to be able

19  to have a career in the military and be able to come out and

20  support your family.  That didn't happen for him.

21        So he comes out of the military, he comes back home,

22  he eventually starts working for his parents.  His parents, his

23  father, owned -- it was a family-owned HVAC company.  He ended

24  up getting his certification and he worked for them for about

25  16 years.

1          During that time his family life fell apart.  He and
2    his wife divorced.

3          I had stated earlier that Mr. Yotka did not have any
4    substantiated objections to the presentence investigation
5    report.  And what I meant by that, and I'll clarify, is that in
6    the presentence investigation report his wife makes the claim
7    that he forced her to have sex with other couples.  Mr. Yotka
8    vehemently denies that.  He says it was consensual.  And, in
9    fact, he said that his wife left him for one of the individuals
10   that they were engaged in sex with who was living with them at
11   the time.

12         We were not able to locate that individual to
13   substantiate Mr. Yotka's position, but that is what Mr. Yotka
14   has told us, that his wife left him for an individual who was
15   living with them who they were engaged in sexual activities
16   with.

17         Additionally, Mr. Yotka raised his oldest sons.  Now,
18   one of his sons claims that Mr. Yotka abused them.  Mr. Yotka
19   has indicated that he didn't -- he did not abuse his son.

20         We wanted to clarify to make sure that the abuse
21   wasn't sexual.  We contacted the son.  The son said that it was
22   not sexual, but he did describe what he said was abuse.

23         Mr. Yotka has indicated to us, and we don't have
24   reason to believe otherwise, that it was just general
25   parenting.  But nevertheless, as the Court may know, I mean,

1    what a parent might think is normal can be seen as being

2    abusive.

3         But in any event, from Mr. Yotka's perspective, he

4    raised his sons the best he could.  And therefore, that's one

5    of the other factors that we are talking about when we say we

6    cannot substantiate his objection.  But nevertheless, that is

7    what he's saying.

8         Mr. Yotka worked for his parents for a period of

9    about 16 years.  During that time, as he indicates, their

10   relationship deteriorated.  And I think that had a lot to do

11   with the fact that Mr. Yotka did not believe that he was being

12   appreciated by his parents for his dedication and work, staying

13   in the family business and trying to make it work.

14        His parents eventually closed the business or sold it

15   or just dissolved it.  In any event, Mr. Yotka then had to go

16   and seek other employment.  And as the presentence

17   investigation reports, he did.  He went from employment to

18   employment to employment.  Again, all the purpose being to

19   provide the funds necessary to provide for his kids, because he

20   did eventually have two other children from another individual.

21   And Mr. Yotka was trying his best to support his family.

22        He found himself most recently working at the

23   Jacksonville Sheriff's Office, as the government has indicated

24   and as the report does reflect.

25        Again, up until that time Mr. Yotka has just been

1   doing what a normal individual would be doing in their life.

2   Mr. Yotka, prior to this incident, had never been arrested for

3   anything.  No traffic ticket, nothing.  Just an individual,

4   again, who's going about daily life just doing the best that he

5   can.

6           At some point in time he became involved in the

7   viewing of child pornography, and then that led to where we are

8   today.

9           I would suggest to the Court that -- and as Mr. Brown

10  was going through the number of individuals that this Court --

11  or that have been sentenced in this courthouse, referring to

12  two of the cases which I had, it's kind of difficult for me to

13  make comments about that.  But the only one I will comment

14  about is Colum Patrick Moran, which is currently on appeal and

15  is still -- an opinion has not been rendered by the Eleventh

16  Circuit, so I will point that out.

17          But I would suggest in this particular case that a

18  term of 40 years, that is, 20 years on each count consecutive,

19  is more than appropriate.

20          And I understand, you know, the actual conduct that

21  was engaged, both the physical contact and also the

22  distribution of the images.  But I just want to emphasize the

23  fact that Mr. Yotka, up until most recently -- there is no

24  indication that Mr. Yotka engaged in any type of conduct of

25  this nature prior to 2021.  And yes, it is fortunate that he

 1  was apprehended, and he is now facing the consequences of it.

 2  But again, as I indicated, when he first came into contact with

 3  the FBI, he acknowledged all of his conduct as it related to

 4  his engagement with these children.

 5          And so I would suggest, again, like I said, a term of

 6  20 years consecutive on each count would be appropriate.

 7          Thank you.

 8          THE COURT:  Thank you, Mr. Grant.

 9          Mr. Yotka, as I said, you don't have to speak but it

10  is your right to do so.  Is there anything that you would like

11  to say at this time, sir?

12          THE DEFENDANT:  I would just like to say that, you

13  know, this has been the worst thing that I've ever gone

14  through.  And, you know, the fact that from here on out I don't

15  get to see my kids graduate high school or get their driver's

16  license, go to college, get married, have their family, that's

17  probably more painful than anything I've ever experienced in my

18  life.  And to honestly say that, you know, this just isn't

19  worth anything that should be done.  And I just -- you know, I

20  put myself at your mercy.  And that's it.

21          THE COURT:  All right, sir.  Thank you.

22      (Pause in proceedings.)

23          THE COURT:  Mr. Grant, is there any bar to

24  sentencing?

25          MR. GRANT:  No, Your Honor.

1        THE COURT:  Mr. Brown?

2        MR. BROWN:  No, Your Honor.

3        THE COURT:  And the Court -- consistent with

4   Mr. Brown's representation, the Court simply makes note on the

5   record that there is no victim in the courtroom.

6        Mr. Yotka is before the Court having pled guilty to

7   two counts of production of child pornography.  His sentencing

8   guidelines would be life but for the statutory maximum.  His

9   guideline sentence is 60 years, which is the statutory maximum

10  for each count.

11       And so the Court, of course, begins by considering

12  the guidelines and then turns to the 3553 factors and looks at

13  the nature and circumstances of the offense and the history and

14  characteristics of the defendant and is charged with imposing a

15  sentence that is sufficient, but not greater than necessary, to

16  accomplish the statutory purposes of sentencing, which include

17  the need for the sentence to reflect the seriousness of the

18  offense; to promote respect for the law; to provide just

19  punishment; to afford adequate deterrence not just for

20  Mr. Yotka, but for those that might have similar interests; to

21  protect the public from further crimes of the defendant; and,

22  of course, always seeking to avoid any unwarranted sentencing

23  disparity.

24       The nature and circumstances of the offense are

25  horrible.  The Court sees many individuals charged with

1    possessing child pornography, charged with distributing child

2    pornography, but not so many of those that actually create the

3    child pornography.

4          Mr. Yotka actually created the child pornography.

5    And more than just creating this contraband imagery, Mr. Yotka

6    physically abused these two young children in the most horrible

7    way.  And he physically abused these two young children that

8    were in his care.

9          And not only was he willing to harm and destroy these

10   children, but he was willing to offer to share them with other

11   people so that they, too, could abuse these two young children.

12         And, of course, he was willing to share the imagery

13   that he created without any regard for the harm of the children

14   not only for his own abuse of them, but sharing it on the

15   internet, where, as we all know, it will never go away.  The --

16   so the offense conduct is horrible.  It's extraordinarily

17   serious.

18         And, indeed, the guidelines -- at level 43, the

19   guidelines are life.  Mr. Yotka's guidelines would actually be

20   level 48, but the sentencing table doesn't go that high.

21         And so the nature and the circumstances of the

22   offense -- simply -- simply creating the child pornography

23   would be bad enough, but the circumstances under which

24   Mr. Yotka engaged in that conduct with the children in his

25   care, and with the willingness to hand them off to another

1  person, just emphasizes his lack of any regard for the

2  well-being of those children.

3        And then when one looks at Mr. Yotka's history and

4  characteristics, his personal history, that's where one would

5  seek to find mitigation, seek to find some reason to understand

6  why Mr. Yotka would behave in this fashion.  And I struggle to

7  identify any mitigating factor in Mr. Yotka's background.

8        True, he has no criminal history, but the guidelines

9  take that into account because he has a Criminal History

10  Category of I.  There's nothing -- unlike many of the

11  individuals that the Court sees, there's nothing that can

12  explain why he would act in a manner that I have to describe as

13  depraved and be willing to victimize these two young boys, and

14  apparently desired to victimize the young girl.  That's part of

15  his history and characteristics.

16        The other parts of his history and characteristics,

17  in addition to not reflecting any significant mitigation, there

18  are aggravating factors.  Mr. Yotka's decision to administer a

19  chat room for individuals interested in incest fetishes and

20  little-kid things suggests a very deep-seated sexual deviance.

21  And by running a chat room like that, he's simply encouraging

22  others.  That is of concern.

23        And also I found it troubling that Mr. Yotka's

24  comments -- in his comments he expressed no remorse for the

25  children or the harm he inflicted on the children, only regret

1  for the impact of his actions on his own life.

2        So in my view, the guideline sentence is the

3  necessary sentence, and I simply struggle to find any reason to

4  vary downward.  And in particular given -- given the reality

5  that, as I said, the guidelines would be -- would be much

6  higher but for the statutory maximum.  And they would be that

7  much higher because of Mr. Yotka's decisions and the gravity of

8  his offense conduct.

9        And so for all of those reasons it's the Court's

10  intention at this time to impose a guideline sentence because

11  that sentence is absolutely necessary to reflect the

12  seriousness of the offense, to promote respect for the law.

13  It's absolutely necessary to accomplish just punishment.  It's

14  necessary -- critical, I would say, for deterrence not just in

15  Mr. Yotka, but to anyone else that would sacrifice the

16  well-being of a child for their own sexual gratification.  And

17  in my view, it's also necessary to protect the public from

18  future acts of Mr. Yotka.  So for those reasons, I intend to

19  impose a guideline sentence at this time.

20        And I'll ask Mr. Grant and Mr. Yotka to come up to

21  the podium.

22        The Court has asked why judgment should not be

23  pronounced and has been given no cause.  I've heard from

24  counsel, I have reviewed the presentence report, and I have

25  heard from Mr. Yotka.  Pursuant to Title 18, United States

1   Code, Sections 3551 and 3553, it is the judgment of the Court

2   that the defendant, Scott Matthew Yotka, is hereby committed to

3   the custody of the Bureau of Prisons to be imprisoned for a

4   term of 720 months.  That term of imprisonment consists of a

5   360-month term as to Count One and a 360-month as to Count Two,

6   with each such term of imprisonment to run consecutively.

7        Upon release from imprisonment Mr. Yotka will be

8   required to serve a term of supervised release of life.  That's

9   life as to each Count One and Count Two, to run concurrently.

10        While on supervised release Mr. Yotka will be

11   required to comply with the standard conditions of release

12   adopted in the Middle District of Florida as well as special

13   conditions.

14        Mr. Yotka will be required to participate in a mental

15   health treatment program specializing in sex offender treatment

16   and he'll have to submit to polygraph testing.

17        He's required to register as -- register with the

18   state sex offender registration agency in any state where he

19   resides, that he visits, where he's employed, or where he

20   carries on a vocation or is a student.  The probation officer

21   will provide state officials with all information required

22   under state and federal sex offender registration laws.  And

23   Mr. Yotka will be required to report to those agencies and

24   engage in any -- participate in any processing they require.

25        Mr. Yotka is prohibited from having direct contact

1   with minors without the written approval of the probation

2   officer and is ordered not to enter into any area where

3   children frequently congregate, including schools, daycare

4   centers, theme parks, playgrounds, et cetera.  He's prohibited

5   from possessing, subscribing to, or viewing images, videos,

6   magazines, literature, or other materials depicting children in

7   the nude or in sexually explicit condition.

8          Without the prior approval of the probation office,

9   Mr. Yotka is prohibited from possessing or using a computer,

10  including a phone or other computer device that is capable of

11  connecting to an online service or an internet service

12  provider.  That prohibition includes a computer at a public

13  library, internet cafe, place of employment, or educational

14  facility.

15         Mr. Yotka is also prohibited from possessing

16  electronic data storage media, including flash drives, compact

17  disks, floppy disks, or using any data encryption technique or

18  program.

19         If Mr. Yotka is permitted to possess any of those

20  devices by the probation office, he must permit routine

21  inspection of the devices by the probation office.  And the

22  probation office must conduct the inspection in a manner no

23  more intrusive than necessary to ensure compliance.

24         And if the condition impacts another individual with

25  whom Mr. Yotka shares the device, Mr. Yotka must advise them of

1  this search party -- of the third -- of the search restriction.

2  And a refusal to permit the search would be a violation of the

3  terms of Mr. Yotka's supervise release.

4         Mr. Yotka is prohibited from having any contact,

5  directly or indirectly, with the minors who are the victims in

6  Counts One and Two of the indictment.

7         He is required to submit to a search of his person,

8  his residence, his place of business, any storage unit,

9  computer, or vehicle in his possession by the probation office

10  at a reasonable time and in a reason manner based upon

11  reasonable suspicion that there is contraband or evidence of a

12  violation of Mr. Yotka's supervised release.

13         Mr. Yotka is -- will be required to provide the

14  probation office with access to any financial information

15  requested as a means of monitoring his compliance with his

16  conditions of release.

17         Having been convicted of a qualifying felony offense,

18  Mr. Yotka is required to participate in the collection of DNA.

19         The Court waives the mandatory drug testing

20  requirements of the Violent Crime Control Act.

21         And Mr. Brown, as I understand it, you're not asking

22  me to defer restitution.  You're satisfied that that's simply

23  not something that's going to be sought in this case; is that

24  correct?

25         MR. BROWN:  Let me just confer, if I may.

1     (Pause in proceedings.)

2         MR. BROWN:  I conferred with our victim/witness

3  coordinator, Your Honor, Ms. Daniels.

4         And as I said before, she has been advised of the

5  opportunity for restitution.  She has not elected to take

6  advantage of that.

7         I would ask the Court to consider deferring for

8  60 days.  We'll make one more contact with her.  But I'll

9  notify the Court within -- as soon as we can get in touch with

10  her whether or not -- I'll file a notice that says she -- that

11  confirm she's not seeking restitution if that's, indeed, the

12  case.

13         THE COURT:  All right.  Mr. Grant, it would be the

14  Court's intention to allow that, just in an abundance of

15  caution, given the obligation of the Court to order restitution

16  if it is sought.  Any objection to me doing so?

17         MR. GRANT:  Inasmuch as the Court is required by

18  statute to do so, I do not object.

19         I was going to object to the condition regarding

20  finances, but now I'm going to hold back on that until the

21  restitution issue is dealt with.

22         THE COURT:  Okay.

23         MR. GRANT:  Because other than that, I don't see a

24  reason -- a basis by which the Court can use to restrict his

25  finances.

1    THE COURT:  Well, I didn't impose a restriction on

2  it, I just imposed the requirement that he supply financial

3  information.  So I didn't -- I didn't restrict him from

4  incurring credit charges or anything because I didn't --

5  because I didn't think I was ordering restitution, but I -- but

6  reviewing financial information is a mechanism that allows the

7  probation office to assure that they aren't engaging -- that

8  they aren't violating the online -- the other online

9  restrictions, and so that's why I imposed the one.

10    MR. GRANT:  I never heard it that way.  I'm going to

11  hold back still and I'll address it later.

12    THE COURT:  Okay.  So I am going to -- given

13  Mr. Brown's -- or given what we've just discussed I am going to

14  impose the restriction prohibiting him from incurring new

15  credit charges, opening lines of credit, obligating himself for

16  any major purpose without the approval of the probation

17  officer.

18    However, if it turns out that there is no restitution

19  ordered, Mr. Brown, at that point can I simply amend the

20  judgment by removing that restriction in light of the absence

21  of restitution?

22    MR. BROWN:  I would have no objection to that, Your

23  Honor.

24    THE COURT:  All right.  So -- and then, Mr. Grant, we

25  can talk about the other one at that time.

1          MR. GRANT:  Yes, Your Honor.

2          THE COURT:  All right.

3          All right.  So I'm going to set a deadline of

4    February 18th -- is that a weekend?

5          COURTROOM DEPUTY:  It's a Saturday, Your Honor.

6          THE COURT:  All right.  February 21st.  February 21st

7    for a notice regarding restitution.  If restitution is sought,

8    Mr. Brown, I'll ask you to confer with Mr. Grant and see if

9    there's an agreement; and if not, we'll set a hearing.

10          MR. BROWN:  Yes, Your Honor.

11          THE COURT:  The Court waives the imposition of a

12    fine.

13          Mr. Brown previously advised that there was no need

14    for forfeiture.

15          There are $200 in special assessments which are

16    mandatory.

17          The special -- the JVTA and the AVAA assessments are

18    waived in light of Mr. Yotka's financial circumstances.

19          I have already explained the reasons for my sentence

20    and I won't repeat those reasons now.

21          The Court accepts Mr. Yotka's plea agreement because

22    it adequately reflects his offense conduct and its acceptance

23    does not undermine the statutory purposes of sentencing.

24          Mr. Brown has already moved to dismiss Count Three.

25    So Mr. Grant, is it appropriate for the Court to dismiss Count

1    Three pursuant to the plea agreement at this time?

2                MR. GRANT:  Yes, Your Honor.

3                THE COURT:  Count Three is dismissed.

4                Does Mr. Yotka have any requests with regard to

5    designation?

6                MR. GRANT:  He does, Your Honor.  We would ask the

7    Court to recommend FCI Englewood.  It's in Littleton, Colorado.

8                THE COURT:  I'm told that I have better luck if you

9    tell me why.

10               MR. GRANT:  It is a -- it has a sex offender program

11   there at that facility, and that's the reason why.

12               And secondarily, we would ask the Court -- I don't

13   know if you did include, while he's incarcerated, education and

14   vocation.  I don't know if you did.  I tried to listen, but --

15               THE COURT:  I haven't.  So the Court recommends

16   designation to the facility in Littleton, Colorado.  Englewood?

17               MR. GRANT:  It's FCI Englewood.

18               THE COURT:  Okay.  The Court recommends designation

19   to FCI Englewood given the availability of sex offender

20   treatment at that location and the Court's firm observation

21   that Mr. Yotka is in need of such treatment.

22               The Court also recommends that he be permitted to

23   participate in any educational and vocational treatment

24   available at the facility of designation.

25               And Mr. Yotka will be remanded to the custody of the

1  marshal to await such designation.

2         Mr. Yotka, your plea agreement somewhat limits your

3  appeal rights.  For purposes of this hearing what I need to do

4  is make sure you understand the process for appeal.

5         If you wish to pursue an appeal you have to file a

6  Notice of Appeal within 14 days.  The government also has the

7  right to appeal.  You are entitled to be represented by an

8  attorney in any appeal that's taken.  And if you can't afford

9  one, of course, the Court will appoint one to represent you at

10  no cost to you.  And if you wish to pursue an appeal but you

11  can't afford the filing fee, the Court will accept your notice

12  without prepayment.

13         Do you understand all these things, sir?

14         THE DEFENDANT:  Yes, ma'am.

15         THE COURT:  Do you have any questions about anything

16  we've done here today?

17         THE DEFENDANT:  No, ma'am.

18         THE COURT:  Mr. Grant, any objection to the sentence

19  or the manner in which it was imposed?

20         MR. GRANT:  Your Honor, as the Court is aware, I'm

21  reserving as it relates to those two matters.  But other than

22  that, I do not.

23         THE COURT:  Okay.  Mr. Brown, any objection to the

24  sentence or the manner in which it was imposed?

25         MR. BROWN:  No, Your Honor.

1          THE COURT:  All right.  Mr. Yotka, I won't see you

2     again, sir.  Good luck to you.

3          COURT SECURITY OFFICER:  All rise.

4        (Proceedings concluded at 10:56 a.m.)

5                          -    -    -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      CERTIFICATE OF OFFICIAL COURT REPORTER

2

3    UNITED STATES DISTRICT COURT)

4    MIDDLE DISTRICT OF FLORIDA )

5

6         I hereby certify that the foregoing transcript is a true

7    and correct computer-aided transcription of my stenotype notes

8    taken at the time and place indicated herein.

9

10        DATED this 20th day of January 2023.

11

12                           /s/ Katharine M. Healey
                             Katharine M. Healey, RMR, CRR, FPR-C
13                           Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25